CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RY. CO. *v.* WEHMEIER ET AL.

476

(Decided May 27, 1929.)

*Messrs. Harmon, Colston, Goldsmith & Hoadly,* for plaintiff in error.

*Mr. Theodore Horstman* and *Mr. Robert A. Ludeke,* for defendants in error.

HAMILTON, J. The Cleveland, Cincinnati, Chicago & St. Louis Railway Company filed its petition against Matilda Wehmeier and others to appropriate certain property of defendants for railroad purposes. An amended petition was filed, and the necessary proceedings were had to bring the question before the court for determination of compensation for the property sought to be appropriated.

It appears that the defendants, except the defendant Matilda Wehmeier, waived all claims for compensation, and the case proceeded to trial to ascertain the compensation and damage of the defendant Matilda Wehmeier. The jury returned a general verdict, fixing the value of the land taken and damages to the residue.

Thirteen special interrogatories were submitted to the jury for answer, and the record contains the answers.

Motion for a new trial was overruled, and judgment was entered on the general verdict. From that judgment, the railway company prosecutes error to this court.

Many specifications of error are presented and argued by counsel for the plaintiff in error, which will be indicated in the course of this memorandum.

We will first consider the claimed error in the qualification of the jury. This claimed error is grounded on the wording of Article XIII, Section 5,

of the Constitution of Ohio, which provides as follows:

"No right of way shall be appropriated to the use of any corporation, until full compensation therefor be first made in money, or first secured by a deposit of money, to the owner, irrespective of any benefit from any improvement proposed by such corporation; which compensation shall be ascertained by a jury of twelve men, in a court of record, as shall be prescribed by law."

This constitutional provision is not self-executing.

It is argued that there were five women accepted, who sat on the jury, and that therefore the jury was not a legal jury within the provisions of the Constitution above set forth.

In considering this proposition, it may be well to state that the objection at the time of the impaneling of the jury was not such as would raise the question. It appears from the record that, when the jury was being drawn, Mr. Hoadly, counsel for the railway company, moved the court to require the sheriff and the clerk to return to the jury box the names of women drawn, and to draw a sufficient number of men, on the ground that the Constitution, Article XIII, Section 5, so required. This motion was overruled. Following this action of the court, the only thing that appears on the record is:

"Wednesday, March 28th, 1928. By Judge Oppenheimer, counsel for plaintiff: If Your Honor, please, this question has already been raised. But in order to preserve the record, we think it advisable for us, under Article XIII, Section 5, to challenge all of the women, a challenge to the array, and not of the drawing of the names, I think you

have already passed on that. I think it is the time we have to do it, and now make objection. Objection overruled by the Court. Exception taken by Judge Oppenheimer.''

The record discloses that immediately thereafter began the examination of witnesses. There is nothing in the record to show that there were any women on the jury, other than suggested in the objection. If there were such, it required an ascertainment as to who they were, and a challenge for cause. A challenge to the array was not proper, since there was no objection to the manner or method in the drawing of the jury. The objection assumes that seven of the members of the jury were male, and not subject to challenge. We do not understand that a blanket challenge for cause can be made to several members of the jury, but rather that the question must be raised personally and individually.

However, passing the question as to the sufficiency of the challenge, we will express our view of the provision of the Constitution in question. The pertinent part of Section 5 is the clause, ''which compensation shall be ascertained by a jury of twelve men, in a court of record, as shall be prescribed by law.''

What then was the intendment of this provision of the Constitution? The makers of the Constitution were protecting the owners when property is taken without their consent for corporate purposes. They thereupon provided that full compensation shall be made, without taking into consideration any benefit growing out of the improvement proposed. To secure this they undoubtedly were pre-

serving inviolate the right of a trial by jury, and intended that that jury should be composed of a common-law jury of twelve. At the time of the enactment of Section 5, women were not enfranchised, and were not competent by reason thereof to sit as jurors. Under those circumstances, the makers of the Constitution only considered qualified jurors, as recognized at the time, and, by the term "a jury of twelve men," they were undoubtedly preserving the common law jury composed of twelve qualified jurors. This construction is justified in the light of the use of the word "men."

Since the world began, in all writings concerning the human race, the word "man" or "men" has been used in a generic sense, or as representing the human race. The courts in construing the term have given it a generic or restricted meaning, as denoted or indicated by the context and the object sought to be obtained. Lexicographers define "man" or "men" as a human being, or an individual of the genus homo; also as the human race; mankind; human beings, etc. Applying this definition, and the rule as to the object sought, we find here in Section 5 to the Constitution, in question, that the object was to secure a jury of twelve qualified jurors. This is further borne out by the last clause, which is, "as shall be prescribed by law."

The Nineteenth Amendment of the Constitution of the United States enfranchised women.

The qualification of a juror, under our General Code (Section 11423) is that such juror must be an elector. These provisions make women eligible to jury service, and come within the constitutional phrase, "as shall be prescribed by law."

We are therefore of the opinion, taking into consideration the object sought to be obtained in Section 5, that the word "men" is used in a generic sense, and does not mean males. We find and so hold that the objection to the jury, by reason of women being on the jury, if such there were, is not well taken, and there was no error in the court's ruling on the question.

Another point of error stressed is the refusal of the trial court to permit an amendment to be filed to the amended petition.

This amendment was tendered a few days before trial, and, on objection thereto, the court refused counsel permission to file same. The amendment to the amended petition, as we read it, simply enlarges upon the uses which the railway company intends to make of the property taken. While it is true the statute requires the petition to state the uses to which property taken is to be put, it does not indicate that any detailed statement is required. The amendment to the petition indicates that there was a desire to set up and prove that some of the property taken would only be used in constructing a retaining wall, which would not be as damaging to the property as other uses. If, under the petition, these questions were proper and pertinent to the issue of fixing values, which, however, we do not hold, no amendment would be necessary. If such evidence was not admissible in proving damages and values, then the amendment tendered would not be proper.

If the amendment made a new issue, it would be improper.

Moreover, the filing of an amendment is largely

within the discretion of the trial court, and, unless that discretion is abused, it is not error.

We do not find any abuse of discretion in refusing leave to file the amendment to the amended petition, and there was no prejudicial error on the part of the trial court in refusing leave to file the same.

It is contended strongly that the judgment rendered in the case is for a grossly excessive amount, and we gather from the argument that this excess amount largely grows out of the interpretation of the law and the evidence as to the manifest injury to the residue of the property not taken, within the meaning of Section 11057 of the General Code of Ohio, which section reads:

"When a building or other structure is situated partly upon land sought to be appropriated, and partly upon adjoining land, and such structure can not be divided upon the line between such two tracts without manifest injury, in assessing the compensation to any owner of the lands, the jury shall assess its value exclusive of the structure, and make a separate estimate of the value of the structure. The owner of the structure may elect to retain its ownership, and to remove it, or accept the value estimated by the jury. If he fails to make such election within ten days from the date of the jury's report, or within ten days from the termination of the cause in a higher court to which it is taken, he shall be deemed to have elected to retain and remove the structure. If he elects to accept the value of the structure, the title thereto shall vest in the corporation making the appropriation, with the right to enter upon the land for the purpose of removing it therefrom."

It is argued that from the evidence there is no manifest injury within the meaning of the statute. This involves the question of the weight of the evidence on that proposition.

The case was most thoroughly tried, occupying nearly a month of time, and presenting a record of over 1,400 pages, with many exhibits attached. An analysis of the evidence on the point would be impossible in a memorandum of reasonable length. We will say, however, that it is admitted that the appropriation takes porches, stairways, and entrances from some of the buildings. It is contended that these removals manifestly injure the remaining parts of the buildings. The statute does not declare what shall or what shall not constitute manifest injury, but leaves that to be determined as a question of fact. It seems anomalous to say that you can take away a part of a building without manifest injury, even though the same has been severed.

Manifest injury has been defined by the courts and the lexicographers and law text-writers, and that definition was given to the jury by the trial court in the special charge, and properly given, although objected to at the time by counsel for the plaintiff. That definition was given to the jury in defendant's special charge No. 3, as follows:

"The jury is instructed that the word 'manifest' as used by the Court when referring to 'Manifest injury' means:—Apparent; clear; evident to the eye and understanding; evident to the mind; evident to the senses; needing no evidence to make it more clear; obvious; obvious to the mind; obvious to the understanding: plain; that which is open, pal-

pable, uncontrovertible; unmistakable; visible to the eye."

In our opinion the court would have been justified under the evidence in instructing the jury that there was admittedly manifest injury to the buildings, and it was therefore their duty to fix the values accordingly. However, the court left it to the jury under this instruction, and the special interrogatories were submitted to determine the question of manifest injury under the circumstances. The record discloses ample evidence which would justify the submission of this question to the jury.

It is argued that there is a great deal of evidence wrongfully admitted on the part of the defendant, and evidence wrongly excluded, offered by the plaintiff.

In a case as elaborate and extended as the case at bar, in which over 1,100 pages of evidence were taken, and between thirty and forty witnesses examined, it would be strange indeed if there was not considerable testimony of doubtful admissibility or lacking in probative value. The objections were largely directed to the qualification or lack of qualification of the witnesses to testify and give opinion values. On this question this court, in the case of *Cincinnati Street Ry. Co.* v. *Hickey,* 29 Ohio App., 399, at page 401, 163 N. E., 310, 311, in passing on the qualification of witnesses to give opinion evidence on damages, stated:

"Some of the witnesses, called to give opinion evidence, did not appear well qualified to give such opinion evidence; but this affected the weight, and not the admissibility, of the evidence.

"It is the rule that a reasonable amount of discre-

tion may be exercised by the trial court in permitting witnesses to give opinion evidence, and, unless evidence so admitted appears to have been prejudicial, a verdict will not be set aside because of the court's ruling on its admission."

We have examined the evidence as pointed out in the brief of plaintiff in error, and are of opinion, taking into consideration the vast amount of competent evidence on the same subject, pro and con, that no prejudice resulted to the plaintiff in error in the court's rulings.

Plaintiff in error complains of defendant's special charges 1 and 3, given by the court.

Special charge No. 1 is a statement of the statutory law, and concerns what shall be done where a building cannot be divided upon the line between the property taken and the residue without manifest injury, and certainly there was no error in stating the law, whether it be statutory or judicial pronouncement, and certainly this section of the Code was applicable.

We have already commented upon special charge No. 3, in which the court defined the term "manifest injury." The case would not have been properly submitted to the jury had not such instruction been given to it, either in a special charge, or in the general charge.

Objection is also made to the giving of defendant's special charge No. 4. The court would have been justified in refusing this charge, for the reason that it is somewhat involved and confusing, but careful analysis discloses that no rule of law was contravened, and there was no prejudicial error in giving it.

Plaintiff in error submitted seven special charges, each and all of which are lengthy and more or less involved, and, by reason of their length, we will not set them out here. It is sufficient to say that, while these charges contain some correct propositions of law, there is injected therein language which qualifies and confuses the rule, so that the court was justified in refusing them.

Special charge No. 3 is as follows:

"I charge you that in assessing the amount of compensation due to Mrs. Wehmeier for the land to be appropriated, you are to take into consideration the purposes for which such land is to be used, as set forth in the amended petition herein, and in the exhibits thereto attached, and no others."

This charge is limited to the question of compensation for land to be appropriated, and says nothing with reference to the damage to the residue, and is misleading on the issues of the case.

Counsel for the plaintiff in error also argue strenuously on the claimed misconduct of counsel at the trial. This is not made a ground of error in the petition in error, and cannot be considered. It is true plaintiff in error sought to introduce this question in the case by the filing of an amended petition in error after 70 days. Defendant in error filed a motion to strike, and the motion is well taken. This would raise a new ground of error. The law requires petitions in error to be filed within 70 days from the judgment, and the question is jurisdictional.

Error is claimed in the refusal of the court to enter judgment on the special verdicts.

The record discloses that in the thirteen interro-

gatories there were questions answered by the jury which were also involved in the general verdict.

In the general verdict, the jury found, under "Damage to Residence or Cottage, Including Portion of Lot Left, $500.00." In the special interrogatory, the jury found this amount to be $200.

In the general verdict, the jury found, under "Damage to the Residence or Stucco Building, Including Portion of Lot Left, $800.00." In the special finding, the amount found was $396.50.

It is the law that, where special findings are in conflict with the general verdict, the special findings will control. The judgment will therefore be modified by reducing the amounts of the sums named in the general verdict to correspond to the amounts contained in the special findings. *Central Gas Co.* v. *Hope Oil Co.*, 113 Ohio St., 354, 149 N. E., 386.

There is objection made to the fact that some of the special findings were signed by less than twelve of the jurors. This objection is not tenable, in view of Section 5 of Article XIII of the Constitution, containing the phrase "as shall be prescribed by law," and the law provides for a three-fourths jury verdict. The findings were all signed by three-fourths or more of the jurors. The general verdict was signed by twelve. See *Miami Conservancy District* v. *Mitman,* 100 Ohio St., 315, 125 N. E., 875, and *Maumee Valley Rys. & Light Co.* v. *Hanaway,* 7 Ohio App., 99.

The judgment will be modified by inserting therein the amounts reported in the special findings, as above noted, which are inconsistent with the

amounts found in the general verdict, and, as so modified, will be affirmed.

*Judgment modified and affirmed.*

CUSHING, P. J., and ROSS, J., concur.